We'll hear argument next in Case No. 19-518, Colorado Dept. of State v. Michael Baca. I note at the outset that Justice Sotomayor is recused in this case. General Weiser. Thank you, Mr. Chief Justice, and may it please the Court. The Constitution authorizes states to use their plenary authority to remove a bribed elector, one who engages in a rebellion, or one who would perpetrate a bait-and-switch on the people of their state by voting contrary to a binding pledge. By contrast, if a state wishes to treat electors as free agents rather than as proxy voters, it is free to do so. In short, states determine how to select electors and ensure that they meet the relevant requirements and perform their duties as assigned. This means, under Greene, that states can oversee bribery as an incident as a power to appoint. This must include the power to remove an elector without requiring a full criminal trial. Under my friend Mr. Lessig's position, as a practicality, bribed electors would cast ballots and illegal votes. In this case, the state prevented Mr. Baca from casting a legal ballot, just like it's an illegal ballot if you don't sign it here in Colorado. As this Court explained in Wray, the purpose and history of the Twelfth Amendment reflected the reality that electors acted as pledged agents for their political parties, and the history of such pledges should be given great weight. As to Justice Ginsburg's point about the importance of enforcing a pledge requirement, it's worth noting people rely on such pledges, which are taken voluntarily, and as Justice Scalia explained in the Inter-Tribal Council case, voting requirements would be of little value if not enforced. In the almost 70 years since Wray, states have continued to enact laws to enforce elector pledges. Congress has consistently deferred to the state's plenary authority, and no court other than the Tenth Circuit below has invalidated a pledge-finding law. Mr. Chief Justice, I would welcome your questions. My first question is to ask if there is anything that General Purcell said on behalf of the state of Washington with which you disagree. Thank you so much, Mr. Chief Justice. I would only add a slight wrinkle. He did indeed endorse our Tenth Amendment argument. What I would say on that is the Tenth Amendment is an important interpretive principle because the Constitution gave the state's authority over elections. The Tenth Amendment underscores that point. Would you state for me exactly what you think the limits on the state power to replace electors are? Your Honor, here I would echo my colleague from Washington. It governs whether or not another constitutional provision is violated. The Fourteenth Amendment quite notably means a state could not remove an elector based on race or religion. Also, the Qualifications Clause means you can't remove electors for the purpose of adding qualifications for who can be president. So, if you selected electors, one of the requirements is they had to be relatives of the legislators, that would be all right? Your Honor, here in Colorado, we picked electors in 1976. The state legislature did it directly. As long as that choice doesn't violate a constitutional provision, they can pick whoever they want. What if the rule is the electors are chosen pursuant to slates, but anyone who says anything disloyal to the state between the time they're selected and the time they cast their vote will be replaced? Your Honor, as my colleague from Washington noted, once people are voting to make a choice, people have a right for their ballots to be counted. And here, in the hypothetical you just noted, the ballots of people would be invalidated after the fact. That implicates Gray v. Sanders and this Court's line of right-to-vote cases. Any other limitations on the power of the state? What about the bribery cases that have been, or bribery hypotheticals that have been discussed? Thank you, Mr. Chief Justice. The ability to remove bribed electors is crucial for the states to have, and not only after a criminal trial, but after there's a basis for this concern. To your point, if a state failed to remove a bribed elector, the state would not have violated a constitutional provision per se, it would have violated its duty as a sound overseer of presidential elections. That's even after the electors have been chosen. In other words... Go ahead. Mr. Chief Justice, the state is indeed authorized to remove electors who've taken a bribe, if that's your question. Yes. What about your power to appoint argument? It does seem, certainly our cases involving the power to appoint by executive officials or the president, do say that it carries with it the power to remove. But that has always been with respect to inferior officers. And the electors here, it seems to me, are not inferior in any way to the state legislator. They carry rights as appointees, carrying out federal responsibilities as well. So I don't see how those authorities support your position. Your Honor, we disagree. The Constitution clearly gives states plenary power over electors and acting as a steward of the presidential election system. That means if electors were to take a bribe, for example, or not to show up, it's on the state to address that point. If you only left this to Congress in the final instance, that would mean that all Congress could do is remove the elector and not have it be counted. What the states can do is replace an elector and make sure that the state has the constitutionally authorized votes in the electoral college. As such, the states play a critical role, and that role includes the power to remove. Thank you, General. Justice Thomas? Thank you, Mr. Chief Justice. General, you start your brief questioning standing in this case. I wonder if you think, under our precedent, they're standing when a person is removed from an elected office. Your Honor, the past cases involving removal from an elected office, like Powell, for example, involve an official with a salary. What's unique here is there's no salary or other personal injury. What's at issue here is the institutional role itself. And as this Court made clear in Smith and a line of cases, an individual doesn't have standing to challenge an institutional role that he or she may believe is unconstitutional. So in a removal case, at what point do you think there would be an injury, in fact? Justice Thomas, insofar as someone gives up a salary, like in Humphrey's executor, you have injury, in fact. If it is an honorary position, a volunteer position, there's no personal injury. There's merely a quarrel with the institutional role. On a separate issue, you know, throughout, I guess, our history, there have been pledges among electors. But can you point to me, point out the first state law that required pledges in our history? I can, Justice Thomas. It was Oregon that did so in the late 19-teens. And what I want to underscore is that wasn't the first time an elector was removed for violating a pledge. In 1912, Nebraska, without any elector binding law, did remove an elector who had promised to violate the pledge because the court in that case, the Nebraska Supreme Court, said it would have been a fraud on the people of Nebraska. You attach yourself to the arguments of General Purcell. So I do want you to, I understood his comments on the scope of the federal function concept or argument. Could you give me what your take is on that? With pleasure, Justice Thomas. Our view is that doctrine doesn't really fit here. Under the Constitution, it's the role of the states as stewards overseeing the presidential election process. The typical federal function case, like McCulloch v. Maryland, you're worried about a state interfering with a federal official. Here, as this court has made clear on multiple times, electors are not federal officials. They are appointed by and overseen and transmit the vote of the states. Thank you, General. Justice Ginsburg? Can you give us an idea of the practical consequences of a ruling one way or another? How would a ruling against you actually alter our democratic processes? Most states already require electoral pledges. And faithless voting throughout the years has always been rare. So how much difference does it make? Your Honor, the chaos that could result from upholding the Tenth Circuit's ruling is one that could occasion a constitutional crisis. As was noted by my colleague from Washington, if states have no ability to remove bribed electors, and all that's left is Congress's ability to choose to count or not count, the mere fact of bribing electors in an open enough way would knock out electors, would limit who could vote, and ultimately could sway the outcome of presidential election. It's the role of the states to oversee confidence in our election systems, to ensure that the public's voice is heard, and all of those values, the integrity of our elections, are at stake in this case. Returning to the standing question, Baca was removed from his post. Isn't that a stigma, at least? Why isn't it? It may not have economic consequences, but isn't it a blot? On his reputation? And wouldn't that constitute a cognizable injury? Your Honor, the auditor in Smith believed that he suffered a stigma having to implement an unconstitutional statute, and that concern of his stigma was not sufficient to give him standing. I would submit the same rule holds here. Thank you. Justice Breyer? A technical question. This is a lawsuit brought against you, the state, under Section 1983. The Court's opinions, I take it, have made clear that a state isn't a person under 1983. Everybody's waived that argument. Both sides would like us to rule, but can they? If someone sues a foreign country under 1983 and a foreign country can't be a defendant under 1983, can the parties simply get an opinion from this Court by waiving the question? Your Honor, I would start with Justice Ginsburg's opinion in the Northwest Airlines case where she made plain that whether or not there's a claim for relief in a statute is not a jurisdictional question. What we're dealing with here, both under Section 1983 and Eleventh Amendment immunity, is strategic decisions made by our state in the course of litigation. We made those decisions because we wanted to litigate this case on the merits. We believe we have a case on the merits and standing, and that's how we've chosen to proceed. Oh, yes, but that isn't my question. My question is, of course you want a decision from this Court. But Mr. Smith might want a decision about how the Constitution applies to someone in Mexico or to someone in Russia. I mean, can the parties get that advisory decision by simply saying, oh, we waive all the jurisdictional problems, all the non-jurisdictional problems, all the problems that say this statute doesn't apply? Justice Breyer, this Court will opt for whatever ground it chooses with respect to whether the Court has to rule on this issue. The answer is no. This is not a jurisdictional question. For us, this was one of several strategic questions on what grounds to litigate. You got it. The other question I have is, I take it that it's only in 1960 that the first state passed a statute that actually removed or punished a person for voting the wrong way, an elector. So were there cases of bribery that went unpunished before 1960? And was there a single case? If so, how many? And what happened? Were their votes counted, although they were bribed? Justice Breyer, the first statute was in the late 19-teens in Oregon, but before that, there were... I thought the statute, which required a pledge that didn't punish people for how they voted. But regardless, same point. Your Honor, we don't have a history of what types of changes were made. What we know is they happened all the time. As Professor Hardaway notes in his brief, for example, in Michigan, there were electors who just didn't show up, who then were replaced on the day that the Electoral College had to meet. We haven't had electors who are upset about having been replaced or not counted... My question has to do with bribery. And before the first statute was passed, more than 200 years after the Constitution was first created, were there instances of an elector being bribed? And if so, how was it handled? We don't know of any such instances, Your Honor. Thank you. Justice Alito? In past elections, were there concerted campaigns to influence electors after the popular vote was cast for the purpose of either reversing the result that was produced in the Electoral College by the popular vote or throwing the case into Congress? Justice Alito, the most famous such case would have been in 1876 involving the Tilden-Hayes disputed election. My other question is essentially the same one that concerns me with respect to the positions of all the counsel in these two cases. And that is limitation, if any, on the arguments that are being made. So, is it your position that a state has plenary power to remove an elector? If not, under what circumstances can an elector not be removed? Your Honor, from McPherson, we do see plenary authority oversight and removal power of electors. And the constraint on that is other independent constitutional conditions such as ones we've discussed previously under the 14th Amendment, for example. So, suppose the legislature is in the hands of a political party other than the party of the candidate who wins the popular vote in the state. Can the legislature simply remove all of the electors who were pledged to vote for that candidate and replace them with other electors? Justice Alito, this is an important point. Let me first answer your question then get to a slightly different one that raises the same concern. If the legislature announces the procedure in advance and gives people the right to vote, and they exercise that right, the legislature cannot undo the public's right to vote without violating the right to vote line of cases. However, if the legislature acted earlier, say the prior spring, to change the process to give itself the power to appoint electors, not the power in the hands of the people, that's a choice state legislatures could make. In McPherson, it was litigated whether or not a legislature could move from a winner-take-all to a districting system. There was a partisan motivation for that change and the court said the legislature's power was plenary. Well, if we agree with you that the legislature has plenary power to remove electors, then won't the people of your state understand when they cast their vote for president that the legislature has the power to remove the electors pledged to the candidate they favor and replace those electors with other electors? Justice Alito, what we're asking for, what we believe the right to vote cases require is that the public be told what they're voting on. Per the Chief Justice's earlier question, if the public is told you are merely casting an advisory vote as opposed to a binding one that you can expect will be followed, that's a different case. What is the best right to vote case that stands for that principle? In Gray v. Sanders it says the public has a right for their ballots to be counted. Thank you, Counsel. Justice Kagan? General Weiser, first on your Tenth Amendment point, why doesn't Thornton foreclose that argument? Thornton said that the Tenth Amendment reserves only those powers that the states held prior to the ratification of the Constitution. I would think that the power we're talking about here is not such a power, but instead was created by the Constitution in the first instance. So how can the Tenth Amendment support you consistent with Thornton? Thank you, Justice Kagan. What I would suggest here is a similar principle to what Justice Kavanaugh articulated earlier. Justice Kavanaugh noted the chaos principle means if you have a closed case, you avoid creating chaos. We would say if you have a closed case, you avoid intruding on federalism concerns. And that's grounded and represented by the Tenth Amendment. But again, I thought that that was only as to the powers that the states held prior to the ratification of the Constitution. Your Honor, as a strict matter, that is what the Tenth Amendment does, but there's also the interpretive principle picked up, for example, in Gregory v. Ashcroft that says when looking at intrusions on state power, limits on state power given to the feds, you do so lightly. Okay, Mr. Lessig ended his argument by giving a number of hypotheticals. He said if a state can do what you're doing, a state can also, say, enforce pledges to vote only for candidates who have visited the state or who have released their tax returns or who take a position on certain issues. Is that right? Not necessarily, Your Honor. The tax returns issue has been litigated under the qualifications clause in California and the court there said that did constitute adding a qualification to be president. But moreover, I would note, there's also an independent question about whether or not you could have a state saying we won't allow someone to be on our ballot in the state at all if they haven't done X, Y, and Z. And indeed, in the California case, it was not in the elector context, but in the access to the ballot context that the issue arose. And if you're relying on the qualifications clause, couldn't you be said to be imposing a qualification to? In other words, that the candidate actually have received more votes than anybody else in your state? Respectfully, Your Honor, I wouldn't interpret that as a qualification to be president, particularly because the right of the states to have a system where the people could be heard is part of the original constitutional design and then, again, confirmed in the 12th Amendment itself. Well, it sort of assumes the conclusion. I mean, it's an understanding of what elections do, but if you assume that these electors were meant to use their own discretion, then the popular vote was not required, and it would be imposing a qualification. Your Honor, if you assume electors have this discretion, you've assumed the answer to this case. We would say they don't have that discretion at all. Exactly, but you're assuming the answer in the exact same way, aren't you? What is there is not a qualification. It depends on this case. I don't think that you can get rid of Mr. Lessig so easily as you would like to. Your Honor, our position is that the Constitution is silent on whether or not you can have electors representing how the public votes. That is inherent in this design, and thus we say what's inherent in design couldn't be an additional qualification. Thank you. Justice Gorsuch? Counsel, I'd like to continue the same line of question that Justice Kagan raised with you and Mr. Lessig suggested. If states enjoy plenary power to remove electors, what would prohibit them from passing a law, for example, to say that all electors have to vote for presidential candidates who support certain positions or who have done certain things or who have visited the state? Now, I understand your ex-post argument, that is states can't change the rules of the election after the election and have to provide voters notice, but if they did it well in advance, what would prohibit them from doing so, if anything, on your view? Your Honor, I'm trying to square how this fits with a popular vote system, because if you give people the power to vote and they exercise the power, then our argument is you count their votes. What I believe you'd be getting at would then be a pre-clearance process where you'd have to pre-clear what electors could be on the ballot before people could vote on them. In that system... Just to interrupt you, I'm sorry, Counsel, but you've indicated it'd be fine for people to have an advisory vote to 12 wise people who would then make the final decision. Why couldn't you also have a system in which the people provide advice within certain parameters set by the legislature? Your Honor, I think that's the same context I had in mind, which is you would basically give people an advisory vote and then after the fact, you'd have to ask... No, not after the fact. They've been alerted prior to the fact, Counsel. That's my hypothetical. I understand your point about after the fact. In advance, they've been notified that they are free to provide advice to 12 electors or whatever the number may be. And their advice, though, is going to be bounded. And there are certain things that the electors have to, because the legislature says, abide by or else they'll be removed. And those are, again, as the presidential candidate visited the state, has he taken this or that position? Has he or she turned over her tax returns? Whatever the conditions may be. It's a bounded choice. You've been arguing that choice can be bounded. This is just another bounds. What prohibits the state from doing that? In this situation, the state can add limitations as long as they comply with other constitutional provisions. And do those? The requirement to visit a state, I don't believe, clearly violates any constitutional provision. The tax return issue, we've noted, raises a qualification clause question that could be a real concern. And... No, the presidential candidate is on the ballot. It's who the electors can vote for. Is that a qualifications problem in the state's view? Yes, it would be, because if you tell electors they can only vote for pick whatever the concern would be, tax returns, people over 50, the concern is you could be adding a new qualification to be president and thereby disqualify, in effect, someone from being president who the Constitution would qualify to be president. How about political positions? You say visiting the state, that's permissible. That condition would be permissible, in your view? Your Honor, I don't see off the top of my head any other constitutional constraint that would address that issue. Our position is the power is plenary or exclusive, as this Court said in McPherson. The state can oversee electors and remove them who don't follow requirements the state deems appropriate. Thank you. Thank you, Counsel. Justice Kavanaugh? Thank you, Chief Justice. Good morning, General. What is the purpose of having electors? Thank you for that question, Justice Kavanaugh. When electors are set up in the constitutional design, that allows for states to make a choice. Electors can either vote as proxy voters on behalf of the public, as we do here in Colorado, or they can be free agents. By having this structure uniform across the several states, you give states the ability to choose which model they want. But wouldn't, if that were the design, why not just leave it to the states as opposed to going through all these details about how the electors are supposed to operate? As you know, Justice Jackson and Ray, looking at that history, said no one faithful to our history can deny that the plan originally contemplated was that electors would be free agents to exercise an independent and nonpartisan judgment as to the people best qualified for the nation's highest offices. That's the end quote from Justice Jackson. So that implies not a choice but actually a requirement that the states give this kind of independence free agent status to electors. And why go through all the details if it's the way, I guess what I'm asking more broadly is the text has all these details to set up a design that seems closer to what Justice Jackson articulates. Where in the text do you hang your hat? Your Honor, our textual hook is the delegation of the authority to the states. By contrast to what Justice Jackson said, James Madison said the Electoral College was all about giving the states authority to oversee presidential elections as they saw fit. And as the majority in Ray noted, contemporaries of the founders did indeed see electors as proxy voters on behalf of the public. And that was absolutely the backdrop to the 12th Amendment. So I would also point you to the 12th Amendment as effectively confirming and accepting the fact that electors can be, indeed most often are, proxy voters, not free agents. Why do you think the founders did not leave it up to the states to decide whether they wanted their members of Congress to be electors? Your Honor, the Constitution had a series of compromises between separating powers between the states and the federal government and between the states. This was one of those compromises that was reached at the final days of the Constitutional Convention. Thank you. Thank you, Counsel. You have a minute to wrap up if you'd like. Yes, Mr. Chief Justice. As we've noted, this case is all about state authority. And on the theory of my friends on the other side, states have no authority even to remove bribed electors short of a full criminal trial. Our founders gave the states this authority, expected them to exercise it in ways that were sound. That's what has been the history of our presidential elections. We would urge the Tenth Circuit decision  Thank you, Counsel. Mr. Harrow? Mr. Chief Justice, and may it is about a tradeoff between flexibility and rigidity. The state's rule is too rigid, and that rigidity could come at a steep cost. The state's finding law has no exception. If a candidate dies between the popular vote and the vote of the electors, there is no exception. If the candidate has a stroke, there is no exception. If there is widely recognized fraud or bribery by the candidate, no exception. If there will be a tied electoral vote and a potentially deadlocked vote, there is no exception. The law is rigid. Electors vote for the winner of the popular vote in the state, or, well, there is no or, Your Honors. That's the only option. That rigidity has no place in our constitutional universe. If something goes awry in this coming election or any other, the framers thought that electors could vote with discretion, and the 12th Amendment didn't change that. More recently, the 20th Amendment's framers, when they analyzed these contingencies, recognized even 150 years after the framing that electors still had discretion, and electors could and should use it in the case of death of a candidate. This shows that, given the current system of presidential selection by an electoral college, there must be times when electors, and only those electors, are best placed to act in the interest of country. Your Honors, the states have a problem with the idea of an electoral college, and they want to write it out. They make no bones about it. They haven't so far today. And perhaps we would be better off without indirect election because this months-long, multi-step process of presidential selection presents some risk of instability, no matter who wins this case. But until we have an Article V Amendment, the vote of real humans, called presidential electors, isn't going away. To make sure the system we have works sensibly, given the Constitution we have now, when those human electors do vote by ballot, they must be permitted to do so with their ballots. Thank you, Counsel. I'll begin by asking you the flip side of the question I asked General Weiser. Is there anything that Mr. Lessig said with which you disagree? No, Your Honor. We filed an opening brief, and I'll sign on to exactly what he said in the first hour. Thank you. You gave a number of examples there of situations that have gone awry, and there was no way to take account of them. But I'm not sure your position has any limits either. What are the limits to your position? The limits, Your Honor, are that electors must be permitted to vote with discretion. And so, as Your Honor knows, there is a choice. There is always the possibility of bribery, always the possibility of corruption, and the framers considered all the possibilities and placed the ultimate selection of president in the hands of a group of presidential electors that were appointed by the state. I take your answer when I ask for limits to be that they must be allowed to vote in their discretion, that you don't have any limits. Your Honor, there are no limits in that voting by ballot, so long as the ballot is for a person. The 12th Amendment says they must vote for a person. You can imagine, not a giraffe? I mean, of course they have to vote for a person. Your Honor, Congress concluded in 1872 that the Greeley vote wasn't a vote for a person because it was a vote for a non-living person. I'm sorry if I wasn't clear. That's the situation that I meant. But those are really the limits of the discretion there. There's great discretion in appointment. You know, the state can absolutely discriminate between all kinds of people, and they do on the basis of political party, for instance. But once the vote begins, that vote by ballot is the elector's. So the elector can decide, I'm going to flip a coin, and however it comes out, that's how I'm going to vote. Yes, Your Honor. That's the same discretion that U.S. senators have, representatives have, congressional electors have. These two are elected officials, and they have that same discretion. Well, that sounds pretty limitless to me. Let's say that an elector has a contract. The different parties insist that electors sign a contract that you will vote, if we win the popular vote, you will vote for our party's  And if you don't, there'll be liquidated damages of $1,000. An elector is selected and breaks that contract, votes for the other individual, even though that individual didn't win the popular vote. Can that contractual commitment be enforced by the state? Not legally, no, Your Honor. And that shouldn't be surprising because that's the same prohibition that applies to congressional electors, who cannot sell their votes. Even though, as a condition of participating in a primary, and we cite these cases extensively in our reply briefs, you can force regular voters to take pledges and oaths to support a party, you just can't cross that line and enforce them. Thank you, Counsel. Justice Thomas? Yes, thank you, Mr. Chief Justice. Counsel, you mentioned that senators are free to vote or members of the House of Representatives, but there's some degree of accountability for them when they vote a particular way. What's the accountability here for an elector who strays from what is expected? There are several forms of accountability, Justice Thomas. The first, of course, is the selection process because they are party people, and in all 50 states, they're selected by the political parties. From there, after the vote, they can be kicked out of the political party, they cannot win an election, they can have negative political consequences, and that's the accountability. Senators do have accountability, but that accountability comes six years later. So if a U.S. Senator, Justice Thomas, promises to support only low taxes and then at every opportunity raises taxes, their only accountability is six years later. That's the nature of political discretion, and that's the discretion electors have here. But there's also accountability in chamber. Within the Senate, there's accountability as far as removal from office, but you're saying that with an elector that those other forms of accountability are not available. They are, Your Honor. There is absolutely party discretion, party meetings, just like any other representative body. And just to quibble slightly, Justice Thomas, with what you said in terms of removal of a U.S. Senator, there's no precedent that we have found of a U.S. Senator being removed, perhaps even by an appointing governor in the case of a vacancy, on the basis of a vote. Certainly some sort of criminal misconduct, sure, but not on the basis of a vote. And that's really the same analogy here. But let's say, you know, you mentioned with respect to the state that the state could not, that after someone dies, their system is so rigid that you can't make changes because of the death of the candidate. But I think that on your side, as the Chief Justice alluded to, you have a similar problem because the elector who had promised to vote for the winning candidate could suddenly say, you know, I'm going to vote for Frodo Baggins, and that's I really like Frodo Baggins. And you're saying, under your system, you can't do anything about that. Your Honor, I think there is something to be done because that would be the vote for a non-person, you know, no matter how big a fan many people are of Frodo Baggins. That said, I do think the important point is that the framers hashed out these competing concerns. They hashed it out in Philadelphia in 1787. They understood the stakes and they said among these competing hypotheticals, electors are best placed to make the ultimate selection. That hasn't changed, Justice Thomas. Thank you. Thank you, Counsel. Justice Ginsburg? I don't understand your point about rigidity because as I understand the state's position is it's the states have a choice. They can say electors have an independent vote or they can say the electors must follow the party's orders. So the states are not, the states are being given leeway to do it one way or the other way. So why do you say it's rigid when it seems to me it could be described as supple because the states can have it either way? Justice Ginsburg, the states do have great flexibility, as you mentioned, in choosing the mode and method of appointment. But the laws that they've written here, the laws that were enforced against my client Mike Baca are very rigid. They are rigid in the sense that there are no exceptions once passed. And that rigidity conflicts with the supposition that every single Congress that has looked at the issue of presidential selection has assumed exists explicitly in 1933 when the Congress drafting the 20th Amendment, that's a key oversight of these laws but even down to the more modern era when Congress was debating the 24th Amendment, for instance, prohibiting poll taxes and noted that it needed to bar poll taxes for elections for presidential electors because they still exist in our system. So that's the rigidity I'm talking about, Justice Ginsburg. And how do you answer the standing question that you have no economic Baca has no economic injuries or has no standing to complain? There is standing, Justice Ginsburg. I will say there is a very small economic injury. We've asked for $1 in nominal damages. Mr. Baca gave up an additional $5 of salary. I'd just like to correct the record where Attorney General Weiser said there's no salary. Colorado Statute 1-4-305 provides electors with $5. That's at pet app 10. So the stakes financially are small but the stakes constitutionally and personally for Mr. Baca are large and they're sufficient to confer standing. Thank you. Justice Breyer. Thank you. To go back to the technical point, you brought a suit under 1983 against a state and it's fairly clear in the case law that you can't sue a state under 1983. What are we supposed to do about that? Your Honor, I'll echo  is that it's and indeed I'll cite the court's opinion just last week in the Simon and Smith case when the court said that the court's job is to resolve disputes as framed by the parties and so the only way that the court should look at that issue is if it's jurisdictional and as Attorney General Weiser said it's not. I'll give you two cites. The problem that I view is that then any two people, plaintiff and defendant who would like an issue decided by us simply have to waive enough matters so that it has to come before us because it's not jurisdictional. They interpret the statutes differently. They do whatever they have to do. What are we supposed to do about that? Your Honor, I don't think this case implements something like that because this case is one that courts surely could hear. It was initially brought individually against the Secretary of State through a compromise that involved the plaintiffs giving up a right to attorney's fees and other accommodations. It was somewhat reframed in order to be brought against the Department of State and as the Tenth Circuit said I'll just point the court to Pet. Act 53-70. I'll look at that. One other question you didn't mention in terms of accountability what I take it, why didn't you, is that Congress doesn't have to count a vote of a faithless elector. For at least 125 years there were faithless electors from time to time and Congress usually counted them and sometimes they didn't. With Horace Greeley, for example, they didn't. So is that not a power that the Congress has to make certain that the faithless elector does not cause trouble? Justice Breyer What's your view about that? What's your actual view? You didn't mention it so you don't think it is probably. No, I think Justice Breyer to be clear that the Greeley example supports our side. The Greeley votes that were rejected... I'm interested in why you don't consider this a significant... I would like your true answer to that. Your Honor, just so I understand, the Greeley votes, the three that were rejected by Congress were actually faithful. They were electors that were pledged to Greeley. But I mean, doesn't Congress have power? There's 3 U.S.C. Section 15, there's the Constitution saying count it. Does that act as a significant check on the faithless elector or does it not? It can, Your Honor. The courts and Congress have never interpreted the Electoral Count Act and what it means for a vote to be regularly given. Congress, I do think possibly has the power to reject a faithless vote under certain circumstances, but we know it has never done so. Those Greeley votes that were rejected were faithful votes for Greeley who was deceased and the 63 votes of Greeley electors who voted for other people who were faithless in some sense, those were all counted. Thank you, Counsel. Justice Alito? We have to interpret the Constitution to mean what it means regardless of the consequences, but I am interested in at least in understanding what the consequences of your position would be. And we are told by experts on elections that the consequences would be potentially chaotic. I'm thinking in particular of Professor Bennett's brief and there's been other writing by experts on elections that acceptance of your position would mean that after an election where the apparent outcome based on the popular vote is a small margin of victory for one candidate, there would be concerted campaigns to change that result by influencing a few electors, and that could be achieved by influencing just a few electors. That's just one of the consequences. There's the fact that in most states the electors are not even listed on the ballots and therefore the voters have no way of trying to ensure that the electors who were chosen are electors who really will honor the wishes of the voters. So do you really deny that this is where your argument would lead? We do deny it, but we do have a very strong argument against this aledo. And here I think past this prologue, Attorney General Weiser in response to a prior question on the same issue, noted that there had been campaigns already to affect electors. He mentioned 1876, the famously contested election of 1876. But in fact, Robert Alexander, a scholar of presidential electors who we cite on the last page of the reply brief in Shafalo, Alexander's research shows that there have been concerted campaigns in 2016, in 2000, and beyond, that some 20% of electors have contemplated switching their votes and that 100% have been contacted. Do you deny that there's a greater chance of this happening? And didn't Mr. Lessig support such an effort in 2016? Your Honor, Mr. Lessig has been representing these in 2016. That wasn't my question. Didn't he advocate that some electors change their votes for the purpose of changing the outcome of the 2016 election? Your Honor, I believe that he supported the legal discretion that electors have that we're here today arguing for. And the reason is, A, that that's in the Constitution, but B, going back to the chaos point, the Center has always held we know that 18 states today, Justice Alito, have no such laws. And the states are not about to say that there's some constitutional requirement that they implement them. In fact, they say the reverse. They say it's a feature and not a bug. Let me ask you one more question if I possibly can. Do the states have any power to remove electors? I can't think of any government office holder who cannot be removed from office. Your Honor, yes, they do have some power to remove electors, just not a removal power that interferes with the core function of voting by ballot. What is the limit of their power to remove? The limit of the power to remove is, again, that interference with the core function. So if an elector does not show up to vote, the states have represented that it's our view that it's impossible to remove an elector. That's not true. That becomes a vacancy. The Electoral Count Act permits it to be filled. History shows that it can and will be filled. Can an elector be removed for bribery, absent conviction by proof beyond reasonable doubt before the time when the electors need to vote? No, we don't think so, Your Honor. And that's consistent with the treatment of every other elected official. Senators and representatives cannot be removed for a supposition of bribery, a mere whisper of it. They have to be removed for proof of it, and the same thing would be true here. A member of Congress could not be removed from office by a two-thirds vote without a criminal conviction? Oh, the Congress certainly has power to remove, but it must go through a full process. I took Your Honor to be asking about the sort of instantaneous removal. One official, one single state official is going to make a decision to kick someone out based on rumor. No, that would be inappropriate for any sort of elected official, and it's inappropriate for electors. Thank you, Counsel. Justice Kagan? Mr. Harrow, suppose that I read the Constitution and I find that it just doesn't say anything about this subject. You know that there are some hints here and there are some hints going the other way, and mostly I just read it and I say the Constitution is silent. What should I then do and why? Justice Kagan, in that case, I think the original understanding would control. Again, we think there is clear language in the Constitution, and I want to return to that, but the original understanding would control because it is so clear, and indeed Colorado doesn't even necessarily challenge it, that the original expectation and the meaning of the word. Sorry, do you mean the original understanding like prior to ratification? Because I would think that pretty quickly it flipped, even if you're right. From the first, there were these pledges, and there have never been a substantial amount, a substantial number of faithless electors. So I would think that the history, both at the time and since, would cut against you, no? No, Justice Kagan, because our quibble is not with the pledges, and our invocation of history is not with the pledges or the idea of party control and of having two major parties in our system. The idea is with enforcement of the vote. The idea is with what occurred here, removing an elector who actually votes. Mr. Baca actually presented a vote and attempted to vote and place it in the ballot box, and that was rejected. That is novel, Justice Kagan. That has only happened in 2016 despite the party control of the selection process. What would you think if I said that if I think that there's silence, the best thing to do is leave it to the states, to not impose any constitutional requirement on them? Your Honor, I would push against because I don't think there's silence, especially here in this... I know, but that's a hypothetical. If I just think that there's not enough in the same way that Ray thought that there was not enough to provide an answer to the question, and there are all these states doing what Colorado is doing, why not just leave it to them? Because, Your Honor, when Justice Kagan, when you said there are all these states doing what Colorado is doing, it has actually never been the case that a state has done what Colorado is doing. That is 220 years of unbroken history. I think that speaks very loudly if Your Honor is concerned about how to interpret that silence. Go ahead, please. No, no, Your Honor, if you're ready to move on, that's fine. I was going to continue making another point. That was directed to Justice Kagan. I'm done. Thank you. Justice Gorsuch? Counsel, suppose Mr. Baca had asked Congress to count his vote, and Congress decided to do so. Would we be here? Yes, you would, Your Honor. There is no mechanism for Mr. Baca to ask Congress to count his vote under the Electoral Count Act, but the state has pointed to any mechanism other than perhaps making a phone call to a senator at the same time. I believe you're citing my hypothetical. Let's suppose he had asked Congress, and let's suppose Congress had agreed to count his vote under the Electoral Count Act. Would we be here? If Congress had counted his vote instead of the vote of the replacement elector, Sholas Landry, then no, perhaps not, because he wouldn't have lost the office. I will say he didn't get a chance to vote for vice president either, so assuming, on Your Honor's hypothetical, that he had his ballots fully cast, then no, we probably wouldn't be here. Okay. He didn't seek, he didn't try to ask Congress to cast his vote. Did he? He did not, Justice Gorsuch. There's no mechanism for it, and the state hasn't pointed to one. And the damages he seeks are, is it $6? Is that right? Justice Gorsuch, it's even less. It's $1 in nominal damages. $1, so it's $1 in nominal damages. Why should we exercise our discretion to hear this case when the nominal damages are $1, he didn't seek Congress to count his vote, though, as you point out, it's unclear whether there's a mechanism to do so. And we have a cause of action that doesn't exist, that we are asked to overlook because of a stipulation by the parties. Why isn't that a sort of manufactured litigation that this court should decline, should bother with, using its discretion, whether to decide a case? Justice Gorsuch, because once there is jurisdiction, and again, I'll just emphasize that the question of whether I'm accepting there's jurisdiction counsel, but this court has discretion over what to entertain. And it also has  of the adversarial process and its proper uses. It does, Justice Gorsuch,  discretion. I think the arguments today in the brief show this is highly adversarial on the standing and on the merits. And the discretion here is because there was a conflict in the lower courts on an important issue, and the unique chance that this court has to decide this issue of presidential selection outside the very contested context of an actively fought presidential election. So to the extent Your Honor is talking about discretion and not jurisdiction, I think it's well exercised here. And again, Colorado doesn't contest that. Thank you. Justice Kavanaugh? Thank you, Chief Justice, and good afternoon, Mr. Harrow. How, if at all, should the quick growth of political parties affect our analysis of this case, including how the 12th Amendment interacts with Article II? Justice Kavanaugh, the political parties provide the context for nominating electors and the appointment of electors. But the fact that there are political parties now and were emerging political parties when the 12th Amendment was passed in 1803 doesn't affect that the word elector remains in the Constitution and that electors are people who vote, and all of those words and all of those structural principles mean that they can vote with discretion. And Justice Kagan noted a question about what to do if the text is silent. And we've talked about various things that could fill the gap there, including the state's authority. Another, of course, under our case law is historical practice. Under cases like Noel Canning and Dames and Moore and many others that we looked at historical practice as a gloss on the text. What is your strongest point on why the historical practice favors you rather than favoring the other side? Justice Kavanaugh, in addition to the historical practices that we've already discussed, including in the exchange with Justice Kagan, I'll also point the Court to the history of constitutional amendments that have been introduced to try and abolish the office of elector, precisely to eliminate the elector discretion that everyone who was introducing the amendment assumed exists. As we point out in our brief, this starts in 1801 with no less than Thomas Jefferson saying, hey, maybe we should get rid of the office of elector. They can only cause trouble. And that continues in the 19th and 20th century. For 20 years, such amendments were introduced by Thomas Hart Benton in essentially every single Congress. And those amendments were not meaningful. And the people who thought that we ought to eliminate elector discretion were not writing on a blank slate. They were writing knowing there was elector discretion. And that would be a lot of wasted oxygen, Your Honor, if there was already a way to eliminate elector discretion and if they didn't have it in the first place. Thank you very much. Counsel, you have a few minutes for a wrap-up, if you'd like. Sure. Just to conclude briefly, as the Court knows, the intervention here was extraordinary and unprecedented. And if you look at the ongoing check that has been baked into this system of presidential selection, there really could be a chaotic outcome. By contrast, most electors have been free in most elections, and here we are today, Your Honor. Indeed, electors retain legal discretion in 18 states, as I've said, and a decision from this Court won't change that. So the question for this Court is whether to approve of the state's novel intervention, and it is novel, and be left wondering how the state's overly rigid interpretation could go haywire, and as we've discussed, the case of death or other unforeseen circumstances, or instead whether the Court should keep faith with the system, keep faith with the Constitution until amended, and maintain indirect election, acknowledging that both sides here, both sides have a vision of presidential selection that is imperfect, but the various checks, balances, and separations that our Constitution's drafters and amenders have put into the Constitution, all of those should be given a role in our constitutional universe, and, Your Honor, I think that all adds up to elector discretion. Thank you, Mr. Chief Justice. Thank you, Counsel. General Weiser, you have two minutes for rebuttal. Thank you, Mr. Chief Justice. Let me make three points in response and offer two closing thoughts. First off, on standing, the payment or nonpayment of the per diem fee was never before alleged, and any reported nonpayment is not in the record. Second, on nominal damages, prior cases like Smith and Byrd did not accord standing on nominal damages alone, instead focusing on whether there's an actual personal injury. Second, as to Justice Scalia's important point about congressional removal in the case of bribery, it's worth noting there is a prescribed removal process for Senators, as Justice Alito noted. In the case of electors, there's no such process, which means this Court's default rule controls. The power to remove is thus incident to the power to appoint. Third, it's worth noting this is the first time we've seen an elector who violated a state binding law. Up until now, including the 2016 election, we've always seen Congress defer and count votes as transmitted by the states. Two closing thoughts. During the course of this entire litigation and this argument today, my friends on the other side have failed to offer any viable theory on how to address the spectacle of a bribed elector, an elector who votes for Frodo Baggins, or one who would perpetrate a bait-and-switch on the people of our state. Colorado's pledge requirement addresses all such harms. After over 230 years of constitutional tradition, my friends on the other side would toss out our nation's state-centered model of electoral accountability in favor of a treacherous experiment. We urge this court to reject this dangerous time bomb and avoid a potential constitutional crisis by reversing the Tenth Circuit's judgment. Thank you. Thank you, Counsel. The case is submitted.